J-A13027-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P., FATHER | : | |
| | : | |
| | : | No. 47 WDA 2026 |

Appeal from the Order Entered November 21, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000111-2024

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                     **FILED: JULY 8, 2026**

M.P. ("Father") appeals from the November 21, 2025 order that involuntarily terminated his parental rights to his son, M.P., born in May 2023 ("Child").[1]  Upon review, we affirm.

We gather the following factual and procedural history of this case from the certified record.  In May 2023, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that Child tested positive for, *inter alia*, opioids and cocaine at birth.  **See** N.T., 6/13/25, at 117.  Prior to Child's discharge from the hospital, Parents separately completed a drug and alcohol assessment and were recommended for outpatient treatment for

---

[1] By the same order, the orphans' court also involuntarily terminated the parental rights of Child's mother, J.V. ("Mother") (collectively with Father, "Parents").  Mother did not file an appeal or participate in the instant appeal.

opiate abuse. *See id.* at 117-118, 121-122. On May 9, 2023, the hospital discharged Child to Parents' custody. *See id.* at 117-118. On May 11, 2023, CYF directed Parents to submit immediately to a drug screen, which resulted in Father testing positive for suboxone.[2] *See id.* at 121. Mother did not submit to the screen. *See id.* The same day, CYF obtained emergency protective custody of Child. Following a shelter care hearing on May 17, 2023, Child was placed in the legal and physical custody of CYF. On June 13, 2023, the court adjudicated Child dependent. *See id.* at 119-120. Child was placed in a pre-adoptive Pressley Ridge foster home where he remained through the conclusion of the termination proceedings. As best we can discern from the record, the court ordered Father to participate in weekly supervised visits with Child. *See* Order of Adjudication, 6/13/23.

The court established Child's initial permanency goal as reunification with Parents. In furtherance thereof, the court ordered Father to, *inter alia*: (1) engage in a psychological evaluation and comply with all treatment recommendations; (2) submit to a drug and alcohol evaluation and comply with all recommendations; (3) attend random drug screens; (4) participate in "coached parenting[;]" (5) complete a batterer's intervention program; and (6) attend supervised visits with Child. *See* N.T., 6/13/25, at 155-156. The

---

[2] Father did not have a prescription for suboxone at this time. *See* N.T., 6/13/25, at 122; *see also* Shelter Care Order, 5/17/23.

juvenile court held regular permanency review hearings between November 2023 and September 2025. In pertinent part, Father did not meaningfully comply with his permanency plan goals or make progress towards alleviating the circumstances that led to Child's removal from his care and custody.

On July 27, 2023, Patricia Pepe, Ph.D. ("Dr. Pepe"), conducted a psychological evaluation of Father and authored a report dated September 23, 2023. *See* N.T., 6/13/25, at 81; *see also* CYF Exhibit 4. Dr. Pepe diagnosed Father with "delusional disorder, persecutory type with bizarre content" and an opioid use disorder. *Id.* at 90; *see also* CYF Exhibit 4. She also noted that Father exhibited agitation and irritability, and he was verbally aggressive toward CYS caseworkers. *See* CYF Exhibit 4. Dr. Pepe recommended that Father's supervised visitation with Child be suspended until he cooperates with treatment recommendations. *See id.* She further recommended that Father submit to a supplemental psychiatric evaluation and begin "intensive dual diagnosis outpatient treatment." *Id.*

In November 2023, prior to CYF acting on Dr. Pepe's recommendations, Father became more erratic and belligerent during his supervised visitations with Child, which culminated in him assaulting a CYF employee and being escorted from the premises by police. *See* N.T., 6/13/25, at 158-159. Therefore, CYF petitioned the court to suspend Father's visitation, which the

court granted on December 12, 2023.[3]  *See id.* at 159-160.  In order to have his visitation reinstated, the court mandated that Father complete a psychiatric evaluation, submit to an updated psychological evaluation, comply with any recommended mental health treatment resulting from these evaluations, and prove his sobriety through "consecutive and consistent clean random" drug screens.  Order, 12/12/23.  As discussed *infra*, Father did not complete these requirements and, therefore, his visitation remained suspended from December 2023 until the conclusion of the termination proceedings in November 2025.

During Child's dependency, Father attended just sixteen out of a total of 107 scheduled drug screens.[4]  *See* N.T., 6/13/25, at 43.  Father briefly attended a coached parenting program, but he was unsuccessfully discharged in November 2023 after he missed three consecutive sessions.  *See id.* at 138-140.  Further, Father was unsuccessfully discharged from a batterer's

---

[3] In January 2024, the orphans' court also granted a motion by CYF requesting all communication with Father occur *via* writing, text message, or electronic mail.  *See* Order, 1/23/24.

[4] Of the drug screens he did attend, Father consistently tested positive for suboxone, which was being provided to him through medication assisted treatment ("MAT") for his opiate abuse, and, on one occasion, he tested positive for tetrahydrocannabinol ("THC").  *See* N.T., 6/13/25, at 44-45.  As best we can discern from the certified record, Father initiated MAT in December 2023.  *See* CYS Exhibit 1.

intervention program in April 2025 due to lack of engagement and inconsistent attendance. *See id.* at 56-57.

Father completed three separate drug and alcohol evaluations on May 8, 2023; July 20, 2023; and December 30, 2024, respectively. *See id.* at 165. Father also completed two psychiatric evaluations with Gregory A. Lobb, Ph.D. ("Dr. Lobb"), in August 2024 and April 2025.[5] *See* N.T., 11/14/25, at 8. Dr. Lobb diagnosed Father with unspecified depressive disorder, unspecified personality disorder with "cluster B" traits,[6] and opioid use disorder in remission with suboxone. *Id.* at 18. Dr. Lobb recommended weekly mental health therapy for Father. *See id.* at 19-20. Despite Father's completion of these various evaluations, however, he failed to abide by any of the resulting recommendations. Overall, he never engaged in mental health or drug and alcohol treatment. *See* N.T., 6/13/25, at 169.

On December 17, 2024, CYF filed a petition seeking the involuntary termination of Father's parental rights to Child, then nineteen months old, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The orphans' court appointed Child's guardian *ad litem* ("GAL") from the dependency proceedings

---

[5] Dr. Lobb also conducted an interactional evaluation with the foster parents and Child. *See* N.T., 11/14/25, at 8.

[6] Dr. Lobb stated that personality disorders are grouped into A, B, and C categories, and that "cluster B" refers to antisocial personality disorder, borderline personality disorder, histrionic personality disorder, and narcissistic personality disorder. N.T., 11/13/25, at 20.

to dually represent his legal and best interests at the termination proceedings.[7]

The orphans' court conducted an evidentiary hearing on June 13, 2025, and November 14, 2025. CYF offered the testimony of, *inter alia*, Dr. Pepe; Dr. Lobb; CYF casework supervisor, Loretta Brown; and Thomas Dillingham, who is the supervisor of Child's pre-adoptive foster care placement through Pressley Ridge. Father was present but did not testify or offer any documentary evidence.

By order dated and entered on November 21, 2025, the orphans' court granted CYF's petition and involuntarily terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). On December 22, 2025, Father timely filed a notice of appeal and a concise statement of errors

---

[7] Inasmuch as Child's legal interests were incapable of ascertainment due to his very young age and being pre-verbal, the court did not appoint separate legal counsel for him. We discern no error. ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020) ("appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a)); ***see also In re T.S.***, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[8]  On

January 23, 2026, the orphans' court filed its Rule 1925(a) opinion.

On appeal, Father presents the following issues for our review:

1. Whether the orphans' court abused its discretion and/or erred as a matter of law in finding that clear and convincing evidence supported termination of Father's parental rights under 23 Pa.C.S.A. § 2511(b) when no bonding assessment was performed between Father and the Child?

2. Whether the orphans' court abused its discretion and/or erred as a matter of law in finding that clear and convincing evidence supported termination of Father's parental rights under 23 Pa.C.S.A. § 2511(b) when the totality of the record does not support such a conclusion?

Father's Brief at 4.[9]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

---

[8] Father's thirty-day deadline to file this appeal was December 21, 2025, which fell on a Sunday.  *See* Pa.R.A.P. 903(a).  His December 22, 2025 filing was timely pursuant to 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on a Saturday or Sunday, . . . such day shall be omitted from the computation.").  *See Interest of R.P.*, 344 A.3d 783, 787 n.2 (Pa. Super. 2025).

[9] Child's GAL filed a brief in support of affirming the order involuntarily terminating Father's parental rights.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. **Id.** at 830; **see also** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (2013); **see also** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b),

- 8 -

in order to affirm termination. ***See M.E.***, 283 A.3d at 830, *citing **In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), (b).

Father has declined to challenge the orphans' court's finding that involuntary termination of his parental rights was warranted pursuant to Section 2511(a)(2), (5), and (8). **See** Father's Brief at 4, 7-16. Accordingly, we will proceed to consider his arguments pursuant to Section 2511(b).

Our Supreme Court has explained that the "plain language" of Section 2511(b) "clearly mandates" that the orphans' court "focus on the child and consider all three categories of needs and welfare." **Interest of K.T.**, 296 A.3d 1085, 1105 (Pa. 2023). In undertaking this inquiry, "courts should consider the matter from the child's perspective," placing the child's needs and welfare above concerns for the parent. **Id.** Furthermore, the orphans' court's determination pursuant to Section 2511(b) must be rendered on a case-by-case basis and in the individual light of each child's specific needs and particular circumstances. **See id.** at 1105-1106, citing **In re Adoption of L.A.K.**, 265 A.3d 580, 593 (Pa. 2021).

To that end, our Supreme Court has identified several specific aspects of the child's welfare that the orphans' court must always consider in this

- 10 -

context. *See id.* at 1106. Specifically, the court must consider: (1) the nature and extent of the child's "bond with the biological parent;" (2) whether the child is "in a pre-adoptive home and whether they have a bond with their foster parents;" and (3) intangibles such as love, comfort, security, stability, and permanency. *Id.* at 1106, 1109. These factors are each of "primary importance" in the context of Section 2511(b). *Id.* at 1109. In addition to these mandatory factors, a court may also "properly consider the effect of the parent's conduct upon the child and consider 'whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights.'" *M.E.*, 283 A.3d at 837, *quoting Interest of L.W.*, 267 A.3d 517, 524 (Pa. Super. 2021).

Where a parental bond is found to exist, the orphans' court "must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *M.E.*, 283 A.3d at 837, *quoting In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). A "necessary and beneficial bond" is one that "serves the child's developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1109. "Extreme emotional consequences" means "irreparable harm," which exceeds an "adverse or detrimental impact[.]" *Id.* at 1110-1111. Our Supreme Court has summarized these considerations, as follows:

> [A]n emotional bond with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child and weighing the other factors present in the record. Likewise, an

- 11 -

adverse effect or detrimental impact of severance alone cannot demonstrate a necessary and beneficial bond.

*Id.* at 1114 (cleaned up).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *T.S.M.*, 71 A.3d at 269. Indeed, the High Court stated:

Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

*Id.* The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Because Father's issues are interrelated, we examine them together. Father essentially contends that CYF did not present sufficient evidence to support termination pursuant to Section 2511(b). *See* Father's Brief at 8-16. Specifically, he argues that the orphans' court abused its discretion by failing to order a formal bonding assessment between him and Child. *See id.* at 9, 14. He argues that without a bonding evaluation, the orphans' court's

conclusion that there is no bond is based on mere speculation.[10]  *See id.* at 11-12.  He further assails the orphans' court's concern for his mental health diagnoses where there was no evidence that he had ever harmed Child or "posed a danger to [] Child specifically."  *Id.*  Father baldly asserts that CYF was required to present evidence on how his conditions "affect his capacity to parent [] Child."  *Id.*  Therefore, Father claims that CYF failed to meet its evidentiary burden pursuant to Section 2511(b).  *See id.* at 15-16.  We disagree.

In its Rule 1925(a) opinion, the orphans' court provided the following analysis of its conclusion that involuntary termination of Father's parental rights was warranted pursuant to Section 2511(b):

> Father has not seen Child since late 2023.  He hasn't attended medical appointments and has no understanding of what Child's current needs are.  There is no bond between the two[,] and Child would not suffer any negative emotional consequences if Father's parental rights were terminated.  In contrast, Child is extremely bonded with his foster parents.  The foster care caseworker, Thomas Dillingham, reported that the foster parents have been providing excellent care for Child and that he seeks them out for

---

[10] We discern that part of Father's arguments seeks to challenge the suspension of his visitation by the juvenile court in Child's dependency proceedings.  *See* Father's Brief at 10, 12.  We emphasize, however, that the instant appeal lies exclusively from the order that involuntarily terminated Father's parental rights.  As such, we may not address allegations of error pertaining to proceedings that are not currently on appeal.  *See*, *e.g.*, *Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021) ("Termination proceedings often occur simultaneously with dependency proceedings, but these two types of proceedings remain distinct, with their own docket numbers, records, and divisions within the Court of Common Pleas.  Father did not appeal from any orders entered in Child's dependency proceeding . . . .").

love and affection. *See* N.T., 6/15/25, at 73. Mr. Dillingham further reported that he has observed a significant bond between Child and his foster parents. *Id.* CYF caseworker, Loretta Brown, testified that Child is bonded to his foster parents and that he seeks them out if he is concerned or fearful. *See id.* at 179. Dr. Lobb completed an interactional evaluation between Child and the foster parents in April 2025. He testified that the foster parents were very engaged with Child and that he seemed very attached to them. *See* N.T., 11/14/25, at 36. Dr. Lobb opined that Child views his foster parents as his psychological parents, was very comfortable with them and very happy in their presence. *See id.* at 49. For these reasons, the court found that the only necessary and beneficial bond that Child exhibited was with his foster parents.

The court would have great safety concerns if Child were ever returned to Father's care. Father's mental health has been a significant concern in this case. Dr. Lobb diagnosed Father as having unspecified personality disorder with Cluster B traits. With respect to Cluster B traits, Dr. Lobb testified that the general "sense of these characteristics are that somebody has sort of this erratic or has emotional instability, impulsivity, difficulty with relationships, lacks empathy, has disregard for other people's feelings, can be manipulative and have no emotional regulation." N.T., 11/14/25, at 20-21. Father has demonstrated aggressive and volatile behavior both in court and with various service providers. In particular, his behavior became so outrageous that it was no longer safe for staff to supervise his visitation. As a result, Father's visitation was suspended in December 2023. Also, as a result of Father's aggressive behavior, the court granted CYF's request that any communication between him and the CYF caseworker be through writing, texts, or email. *See* N.T., 6/13/25, at 162. Father's mental health has remained a concern as evidenced by his communication with the CYF caseworker a few days before the termination proceedings, where he made veiled threats about the outcome of the proceedings. *See id.* at 173-174. While Father has attended the court-ordered evaluations, he has not attended any mental health treatment. He remains unstable and unwilling to address his mental health issues. This along with his failure to complete the recommended level of substance abuse treatment are of great concern for the court as it relates to safety considerations.

Orphans' Court Opinion, 1/23/26, at 6-8 (unpaginated; cleaned up). We have reviewed the orphans' court's findings and citations, we find that they are accurate and well-supported by the certified record, and we agree that Father's mental health issues substantially diminished his capacity to provide safety and security to Child and that these needs would be better met by termination of Father's parental rights.

We also hold that Father's contention that the orphans' court erred in failing to order a formal bonding evaluation warrants no relief. It is well settled that "[w]hen conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Adoption of C.P.D.*, 324 A.3d 11, 27 (Pa. Super. 2024), *citing In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). As detailed above, the orphans' court considered and credited the testimonies of Dr. Lobb, Mr. Dillingham, and Ms. Brown in rendering its findings with respect to the lack of a bond between Father and Child. *See* Orphans' Court Opinion, 1/23/26, at 6-8 (unpaginated). As such, the lack of a formal bonding evaluation in this case is of no moment. *See C.P.D.*, 324 A.3d at 27.

Father has also relied upon our Supreme Court's holding in *In re E.M.*, 620 A.2d 481 (Pa. 1993). Specifically, he cites to *E.M.* for the alleged proposition that the orphans' court could not "meaningfully assess whether a parental bond existed or whether termination would destroy a necessary and

beneficial relationship" without a formal bonding evaluation. Father's Brief at 11. However, we find that this misconstrues the holding of **E.M.** wherein our Supreme Court recognized that the "emotional needs and welfare" analysis pursuant to Section 2511(b) should include, in part, consideration of the child's bond with his or her parent and the effect on child of severing such a bond. **See E.M.**, 620 A.2d at 485. **E.M.** makes no pronouncement that a formal bonding evaluation is required as part of this analysis. As discussed *supra*, Section 2511(b) does **not** require a formal bonding evaluation. **See C.P.D.**, 324 A.3d at 27.

We emphasize that the certified record is bereft of any evidence that Father shared a bond with Child. As such, it was reasonable for the orphans' court to conclude that no such bond existed. **See K.Z.S.**, 946 A.2d at 762-763. There is simply no dispute that the juvenile court removed Child from Father's care approximately one week after his birth. **See** N.T., 6/13/25, at 117-119. Thereafter, Father's contact with Child ended in December 2023 after the juvenile court suspended his supervised visitation based upon Father's violent actions and his subsequent failure to satisfy the conditions set forth by the court to have visitation reinstated. **See id.** at 158-161.

Father also concedes that Child shares a "strong bond" with his foster parents. Father's Brief at 12. Mr. Dillingham, who supervised Child's foster placement, testified that Child is "doing great" with his foster parents who treat him "as if he is their own son." N.T., 6/13/25, at 72-73. Mr. Dillingham

stated that Child has a significant bond with his foster parents. *See id.* at 73. Ms. Brown, CYF casework supervisor, also iterated that Child is bonded to his foster parents. *See id.* at 179. She stated that his foster parents "are the only parents that he knows." *Id.* Based upon the foregoing, we find no merit in Father's arguments challenging the orphans' court's findings concerning the lack of a necessary and beneficial bond with Father.

As noted above, Father has also challenged the orphans' court's consideration of his mental health diagnoses in rendering its termination holding. *See* Father's Brief at 14 (alleging there is no clear "connection between Father's diagnoses and any actual danger to the child"). We emphasize, however, that the orphans' court was at liberty to consider Child's safety and security pursuant to Section 2511(b). *See M.E.*, 283 A.3d at 837.

On direct examination, Dr. Pepe testified about the concerns she had regarding Father's mental health, as follows:

Q: [Y]ou were able to make some recommendations for the [c]ourt, moving forward. [C]ould you please . . . indicate what your recommendations at that time were?

A: Well, as I noted, he was agitated. He did not make direct threats against me; however, I was concerned that especially the caseworker should be very cautious. He had been verbally aggressive towards the caseworker, and I thought he could potentially become physically volatile, based on his presentations and things that he would say.

So I was concerned about general safety. I was also concerned about visitation . . . because I was concerned his behaviors could be unpredictable, and that he could exhibit verbal and physical aggression during the visitation.

N.T., 6/13/25, at 97-98, 106-07 ("[B]ased upon his psychological profile, I was very concerned about aggressive tendencies, both verbal and physical.").

Dr. Lobb proffered similar concerns. Regarding his diagnosis of Father with an unspecified personality disorder with "cluster B" traits, Dr. Lobb testified that "[t]he general sense of these characteristics are somebody that [is] . . . erratic or has emotional instability, impulsivity, difficulty with relationships, lacks empathy, have disregard for other people's feelings, can be manipulative and have no emotional regulation." N.T., 11/14/25, at 20-21. Additionally, as discussed *supra*, the juvenile court suspended Father's visitation following his increasingly erratic behavior and subsequent violent outburst. **See** N.T., 6/13/25, at 158-161. Nevertheless, Father made no attempt to engage in mental health treatment. Accordingly, the orphans' court's safety concerns are well-documented in the certified record, and we discern no error or abuse of discretion.

Based upon the foregoing, we hold that the orphans' court's conclusion that Child's developmental, physical and emotional needs and welfare were best served by the termination of Father's parental rights is fully supported by the certified record, which evinces that Child does not share a necessary and beneficial bond with Father. Therefore, we discern no abuse of discretion or error of law pursuant to Section 2511(b). Accordingly, we affirm the order involuntarily terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/8/2026